Julie Klein Fischer
Shelli D. Stewart
MORROW & FISCHER, PLLC
332 North Broadmore Way, Suite 102
Nampa, Idaho  83687
Telephone:     (208) 475-2200
Facsimile:     (208) 475-2201
ISB No.:        4601, 7459
*jfischer@morrowfischer.com*
*sstewart@morrowfischer.com*

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARISA LANE; CARRIEANNE KOWALCZYK; JOHN DOES 1-100; JANE DOES 1-100,<br><br>                    Plaintiffs,<br><br>-vs-<br><br>HUMANA MARKETPOINT, INC., a Kentucky Corporation,<br><br>                    Defendant. | **CASE NO. 1:09-CV-380**<br><br>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ( Dkt. 37, Filed December 17, 2010)** |

        This memorandum is filed in response to Defendant's Motion for Summary Judgment

filed December 17, 2010 (Dkt. 37).

## I.
## INTRODUCTION

        Plaintiffs allege Defendant Humana Marketpoint, Inc. ("Humana") violated the Fair

Labor Standards Act ("FLSA") for failing to pay them for overtime hours worked during their

employment with Humana.  In response, Humana claims Plaintiffs are exempt from receiving overtime compensation based on the "outside sales exemption" of the FLSA. Thus, whether Plaintiffs have a remedy against Humana depends on the application of the "outside sales exemption" to Plaintiffs' jobs.

Contrary to Humana's arguments, the answer to this question is not found in Plaintiffs' job titles – nor does the analysis end by concluding Plaintiffs were involved in "sales."   Rather, whether the outside sales exemption shields Humana from paying Plaintiffs overtime wages requires the Court to look at what Plaintiffs *actually did* as employees of Humana.

As demonstrated herein, Plaintiffs' job duties involved significantly more than just *selling* Humana products and the exemption is not applicable.

## II.
## SUMMARY OF UNDISPUTED FACTS

Although Plaintiffs have submitted a *Statement of Disputed Facts* herewith, the following detail is provided to assist the Court in gaining a clear and full understanding of the facts that give rise to Plaintiffs' claims.

Humana is a health benefits company that sells various health benefit products and services, its primary focus being Medicare products and services.  *Humana 30(b)(6) Deposition of Troy Buss* ("Humana 30(b)(6) Depo"), 26:17-27:20; 31:25-33:2, attached as **Exhibit A** to the *Affidavit of Julie Klein Fischer in Support of Plaintiffs' Statement of Disputed Facts and Response to Defendant's Motion for Summary Judgment* ("Fischer Affidavit").  Selling insurance related products is Humana's principal goal and the way it makes money as a company. *Id*. at 29:21-25; 31:25-32:5.

Plaintiffs were hired by Humana in 2005 as captive/internal/career sales agents ("captive agents"); neither was provided a job description for the position.[1]  *Deposition of Marisa Lane* ("Lane Depo"), 47:11-19, 51:15-17, attached as **Exhibit B** to the *Fischer Affidavit*; *Deposition of Carrieanne Kowalczyk* ("Kowalczyk Depo"), 13:12-13, attached as **Exhibit C** to the *Fischer Affidavit*; *Deposition of Karen Manazer* ("*Manazer Depo*"), 12:19-13:4, attached as **Exhibit D** to the *Fischer Affidavit*.    In other words, they were employed, at least in part, to sell Humana products.  *Humana 30(b)(6) Depo*, 18:17-19:2.  Plaintiffs were compensated in the form of base pay, plus commissions.  *Id.* at 95:10-19.   The Plaintiffs were among hundreds of Humana employees, nationwide – all interested in Humana succeeding through greater sales, regardless of their position.  *See Id.* at 21:1-24, 29:21-25, 31:25-32:5; *see Manazer Depo*, 16:3-17:6.

Notably, Humana also retains independent/external/delegated sales agents ("independent agents"), to sell its products.  *Humana 30(b)(6) Depo*, 17:7-24, 102:8-106:6; *Manazer Depo*, 13:5-24.   Unlike captive agents, independent agents are not limited to selling only Defendant's products and they work solely on commission.  *Humana 30(b)(6) Depo*, 16:18-18:14; *Deposition of Ed DeVincentis* ("DeVincentis Depo"), 63:22-68:10, attached as **Exhibit E**[2] to the *Fischer Affidavit*.   Additionally, unlike captive agents who are directly supervised by Humana, independent agents have much more freedom.  *Humana 30(b)(6) Depo*, 18:16-20:12, 48:16-49:10, *DeVincentis Depo*, 66:2-13.

As captive agents, Plaintiffs were not allowed to do any outside marketing to solicit their own customers, but instead were required to rely on leads provided by Humana.  *Lane Depo*,

---

[1] After discovery closed, Humana produced a "job listing" it claims corresponds with Plaintiffs' positions at Humana.  *See Defendant's Memo*, pp. 1-2.  Interestingly, the "job listing" was never seen by nor provided to Plaintiffs before or during their employment with Humana.  *Affidavits of Marisa Lane and Carrianne Kowalczyk in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.* Thus, Humana's reliance on the "job listing" to demonstrate Plaintiffs' duties during their employment is improper.

[2] Exhibit E to Affidavit of Julie Klein Fischer contains a confidential deposition exhibit; therefore, Exhibit E is electronically filed as a separate sealed document.

47:11-49:6; *Humana 30(b)(6) Depo*, 56:23-59:16.  Plaintiffs also were not allowed to place cold

calls or purchase leads.  *Lane Depo*, 200:23-201:4; *Kowalczyk Depo*, 53:2-55:1.

When Plaintiffs were initially hired by Humana in 2005, they reported directly to sales

manager, Julia Fenwick.  *Lane Depo*, 51:18-19.  In July 2007, Troy Buss replaced Ms. Fenwick

as sales manager for western Idaho and eastern Oregon and became Plaintiffs' direct supervisor.

*Humana 30(b)(6) Depo*, 14:16-23.   In the beginning of their employment with Humana,

Plaintiffs were involved in selling insurance policies; however and particularly as time went on,

the primary focus of their employment was customer service.  *See Lane Depo*, 54:20-56:5,

57:14-62:11, 114:1-116:21; *Kowalczyk Depo*, 70:2-12.  As their employment progressed, not

only was there more reporting and client contact required, community outreach, brand and

product recognition, as well as grassroots marketing became top priority.  *Id*.  In conjunction

with their sales training throughout their employment with Humana, Plaintiffs also received

extensive customer service training.  *Lane Depo*, 115:1-13; *Kowalczyk Depo*, 62:7-65:8.

Additionally and on top of their other duties, Plaintiffs were required to spend at least

fifteen work hours per week at a Walmart location; Walmart hours were fixed and mandatory.

*Deposition of Julia Fenwick* ("Fenwick Depo"), 16:6-24, attached as **Exhibit F** to the *Fischer

Affidavit*; *Deposition of Troy Buss* ("Buss Depo"), 50:17-51:13, attached as **Exhibit G**[3] to the

*Fischer Affidavit*; *Lane Depo*, 78:14-79:7; *Kowalczyk Depo*, 50:5-51:12.  During those "Walmart

hours," Plaintiffs were required to deal with all customer issues that arose, including those of

other agents' customers.  *See Lane Depo*, 73:11-22; *Devincentis Depo*, 25:11-22; *Fenwick Depo*,

75:8-76:3; *Kowalczyk Depo*, 68:23-70:1.   In other words, they were the face of Humana at

Walmart and fielded any issues or inquiries presented to them.

---

[3] Exhibit G to Affidavit of Julie Klein Fischer contains a confidential deposition exhibit; therefore, Exhibit G is
electronically filed as a separate sealed document.

Throughout their employment with Defendant, Plaintiffs were closely monitored by their sales supervisors (initially Julie Fenwick and later Troy Buss).  During their respective tenures, Ms. Fenwick and Mr. Buss were directly involved with Plaintiffs' daily activities.  *See Fenwick Depo*, 8:23-13:2; *Buss Depo*. 37:12-38:10; *Humana 30(b)(6) Depo*, 63:22-72:21.  Their involvement included delivering leads to Plaintiffs, scheduling and tracking their appointments and seminars, and monitoring their daily reporting.  *See Id*.  Ms. Fenwick and Mr. Buss also engaged in required weekly meetings with their captive agents and required specific timeframes for responding to calls and e-mails. *See Fenwick Depo*, 11:12-17, 58:5-63:7; *Buss Depo*, 41:17-42:18, 44:4-8, 58:24-63:8.

In conjunction with monitoring Plaintiffs' daily activities, Mr. Buss closely monitored their required Walmart hours and if he determined they were not at the Walmart during their scheduled hours he would require a sign-in and sign-out sheet to track when they arrived and when they left.  *See Buss Depo*, 50:17-51:13, 76:18-77:12.  Plaintiffs were also required to log their time into a timekeeping system and submit a time sheet every two weeks; however, the system only allowed them to log 40 hours/week.[4] *Humana 30(b)(6) Depo*, 89:14-94:6.

### III.
### STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, the Court should not grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 1986).  The Court must "view the evidence in the light most favorable to the [non-moving party]," and draw "all reasonable inferences in his favor." *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004); *Devereaux. v. Abbey*,

---

[4] Plaintiffs also were regularly scheduled to work Saturdays unless they specifically arranged with their sales manager to have a particular Saturday off.  *See Lane Depo*, 124:8-18.

263 F.3d 1070, 1074 (9th Cir. 2001).  In considering a motion for summary judgment, the Court may not weigh the evidence or make credibility determinations. *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

## IV.
## ARGUMENTS

### A.   FLSA's Outside Sales Exemption.

The FLSA requires non-exempt employees to be paid overtime for hours worked in excess of forty hours per week.  29 U.S.C. §§ 207 and 213(a)(1).  The question of whether or not employees are exempt from the operation of the FLSA primarily is one of fact and the burden of proving an employee is exempt rests upon the one who claims the exemption. *Wirtz v. Atlanta Life Insurance Co.*, 311 F.2d 646, 647-648 (1963) *citing Fletcher v. Grinnell Bros.*, 150 F.2d 337, 340-41 (C.A.6, 1945); *Walling v. General Industries Co.*, 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088.  "Exemptions to the FLSA's overtime requirement are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments *plainly and unmistakably* within their terms and spirit.'"  *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 585 F.Supp.2d 254, 261 (D.Conn.2008) (quoting *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir.2002) (emphasis added in *Ruggeri*). To qualify for exemption under the FLSA overtime requirements an employee's "primary duty" must be performing exempt work.  29 C.F.R. § 541.700(a).

This case turns on the applicability of the "outside sales exemption" to the Plaintiffs' jobs with Humana.   An "employee employed in the capacity of outside salesman" means one:

(1)     Whose **primary duty** is:
    i.     **Making sales** within the meaning of section 3(k) of the Act, or
    ii.    **Obtaining orders** or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; **and**

>    (2)    Who is customarily and **regularly engaged away from the employer's place or places of business** in performing such primary duty.

29 C.F.R. § 541.500(a).    Section 3(k) of the Act defines "sale" or "sell" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."   29 U.S.C. § 203(k).

The rationale for exempting outside salesmen (or women) from receiving overtime wages was concisely summarized by the 10th Circuit as follows:

> The reasons for excluding an outside salesman are fairly apparent. Such salesmen, to a great extent, work individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir.1941).

In sum, to determine whether an employee is exempt from receiving overtime compensation under the FLSA, pursuant to the outside salesman exemption, the court must look at all the facts of the specific case.

>    *1.    Plaintiffs' Primary Duty Was Not Making Sales.*

It is not disputed that Plaintiffs were involved in sales.  It is, however, disputed that the primary duty performed by Plaintiffs was "sales." Although it may seem overly basic, it is important to start with the meaning of the term "primary."   Primary duty is defined by Department of Labor ("DOL") Regulations as, "the principal, main, major or most important duty that the employee performs." 29 U.S.C. § 203(k).

An employee's primary duty is determined based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  *Id*.  Factors considered in

determining whether an employee's primary duty is "making sales" include, but are not limited to: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) whether an employee's compensation is based wholly or significantly on commission; (4) whether an employee independently solicits new business; and (5) whether an employee receives little or no supervision.[5] *See Id.*; *See e.g., Schmidt v. Eagle Waste & Recycling, Inc.*, 598 F.Supp.2d 928, 935 (W.D. Wis. 2009) (citations omitted). Although these are guiding factors, the test for determining an employee's "primary duty" is intensely fact-specific and has resulted in conflicting application by federal courts. *See Miller v. Farmers Bros. Co.*, 136 Wash.App. 650, 662, 150 P.3d 598, 604 (2007); s*ee also Tumminello v. United States,* 14 Cl.Ct. 693, 697 (1988) ("The determination of whether an exemption applies to a given individual ... is a very fact-specific exercise.").

### i.   *Sales were less important than customer service.*

In this case, even though Plaintiffs employment included selling Humana products for part of each year, their primary duty was not sales – and in fact, over time the importance  of sales became less and less significant as it was replaced with an emphasis on customer service and customer relations.

### a.   *Customer service was a mandatory component of Plaintiffs' job.*

Performing customer service duties was not "optional" for Plaintiffs and failure to do so could result in reprimands or warnings.   For example, at one point, Plaintiff Marisa Lane received a competency and contribution improvement plan ("CCIP") created specifically for her by Troy Buss and Humana's human resources department.  The CCIP directives included:

---

[5] Humana relies heavily on 29 CFR § 541.504(b) for other factors that have been looked at by certain District Courts (i.e., possession of a selling or solicitor's license, description of employees occupation in collective bargaining agreements, hiring qualifications, sales training, attendance at sales conference). *See Defendant's Memo*, pp. 10-12. However, 29 CFR § 541.504(b) specifically relates to <u>Drivers</u> involved in sales - thus, those factors have little meaning in the context of this case.

- Response to request for information must be completed by the end of the next business day following receipt of request.
- If the situation or question cannot be resolved at the point of response to the client, the client   must be made aware of the delay and 48 hour updates must be maintained; 24 hours if a critical care issue.
- Claims and service issues for members must be submitted to MSOP the day you receive them to allow you to maintain your presence in the field as much as possible.
- Copy me so I can help you track the result, and forward to me any responses that I am not copied on.
- Develop a system that works for you, allowing you to document and promote the capability to follow-up and complete all service and sales requests.
- CDS updates/dispositions must be completed nightly reflecting actionable calls made and received.
- Time away from Walmart should be limited only to service clients that cannot change their schedule for an appointment or for training and meetings called by the manager or director of the market.

*Buss Depo*, 77:17-80:9 and Exhibit 9 thereto.  These specific directives demonstrate (and are but one example of) the compulsory nature of the Plaintiffs' customer service duties.

Additionally, captive agents were <u>mandated</u> by Defendant to work at least fifteen hours per week at a designated Walmart location.  *Fenwick Depo*, 16:6-24; *Buss Depo*, 50:17-51:13; *Lane Depo*, 78:14-79:7; *Kowalczyk Depo*, 50:5-51:12.   Specifically, captive agents (including both Plaintiffs) were required to be available at their designated Walmart location, during specified hours, to ensure Humana had a public face.  *See Id*.  During those hours, the agents dealt with an array of customer issues, questions about products, inquiries about products the customer already had purchased (even from other agents).   *See Kowalczyk Depo*, 65:19-70:1; *Lane Depo*, 73:11-22; *Devincentis Depo*, 25:11-22.  During that time, agents also could be called upon to answer billing questions for the Walmart pharmacist, or assist customers and/or pharmacy employees (of Walmart) with billing issues or coverage questions.  *See Id*.  Plaintiffs' former supervisor, Julia Fenwick, made the following statement about "Walmart time:"  "So you could be dealing with anybody's client that popped in while you're sitting there, something that

says Humana all over it, you have your Humana shirt on, they have questions about Humana, you get to service them for no additional remuneration." *Fenwick Depo*, 75:8-76:3.

In addition to Plaintiffs being required to perform customer service related duties from the date of their hire, there also was a significant shift in Humana's emphasis on customer service during Plaintiffs' employment. Specifically in about 2007, Humana implemented what is called "perfect service," a program designed to train and encourage employees to work together to deliver Defendant's brand promise. *See Devincentis Depo*, 54:16-24; *Kowalczyk Depo* 64:22-65:8; *Lane Depo*, 114:1-115:13. The implementation of "perfect service," meant customer service and retention was the number one, most important part of Plaintiffs' jobs: Marissa Lane testified regarding perfect service as follows:

> Q.   So you are saying customer service and customer retention became more important than selling new policies?
>
> A.   Yes.
>
> Q.   Who communicated that to you?
>
> A.   It came from several different levels. It came from our direct manager, Troy Buss, as well as a perfect service training that we received in Salt Lake and from our regional manager, that there was going to be a shift in where our priorities lay, that yes, sales were important, but what we really needed to do was retention and building the product name, getting ready to move forward for 2011 when the private fee for service plans were no longer going to be in existence and we were going to be rolling into different products.

*Lane Depo*, 114:22-115:13.

Thus, the facts in this record do not support the conclusion that Plaintiffs sales duties were the utmost important function of their jobs. Even though Plaintiffs were involved in sales, "selling" was not the foremost, chief, or most important duty they were assigned. Rather, their jobs were fractured into many duties, the most important of which – at least as announced by Humana, was customer service and marketing the Humana brand.

**b.      *Customer service was not merely "incidental to" sales.***

The weight Humana placed on customer service is problematic for an employer claiming the outside sales exemption.  Accordingly, Humana attempts to persuade the court that customer service was merely incidental to Plaintiffs' sales function.  *Defendant's Memo*, p. 4.  However, that is simply not the case.

The DOL Regulations provide that work performed "incidental to and in conjunction with the employee's own outside sales or solicitations" is regarded as exempt outside sales work. 29 C.F.R. § 541.500(b).  The Regulations further state: "work performed incidental to and in conjunction with the employee's own outside sales or solicitations" includes "other work that furthers the employee's sales efforts...for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences."  29 C.F.R. § 541.500(b).

Although there are various federal cases wherein customer service duties were found to be incidental to sales jobs, the Defendant is a bit too eager to rely on the same.  *See  Defendant's Memo*, pp. 4-7.   In other words, because "exemption" cases are fact specific other circuit case law is not necessarily meaningful in the determining whether Plaintiffs were exempt employees. In fact, as discussed in detail below, there are significant distinctions between this litigation and the cases relied on by Defendant.

In *Stevens v. SimplexGrinnell, LLP*, 190 Fed.Appx. 768, 2006 WL 1914247 (11th Cir. 2006), although the Eleventh Circuit found that the plaintiff's customer service duties were exempt, the court relied on specific facts not present in this case.  In *Stevens*, the court relied on uncontroverted evidence that the plaintiff made sales during her service calls and earned commissions on those sales.  *See Id*. at 771-772, 2006 WL 1914247 at 2-3.  The Eleventh Circuit

specifically stated that "[plaintiff's] sales records confirmed that she made sales proposals to all the service customers she identified in her deposition," and found the customer service provided by the plaintiff furthered her ability to make sales that increased her commission. *Id.* Here there is no evidence that Plaintiffs' sales and customer service duties were comingled.

Further, in *Palmieri v. Nynex Long Distance Co.*, 2005 WL 767170 (D.Me.)), the court also relied on specific facts not present in the case at hand. In *Nynex*, the plaintiff was assigned a specific module of customers to whom he was expected to sell products and services. *Id.* at 3. It was only with respect to his assigned customers that he performed any customer service duties. *See Id.* at 14. This particular fact was important to the court's analysis based on the following DOL Regulation relied on by the court:

> Any promotional work which is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is clearly exempt work. On the other hand, promotional work which is incidental to sales made, or to be made, by someone else cannot be considered as exempt work.

*Id.* (*citing* 29 CFR § 541.504(a) (2002) (amended to 29 CFR § 541.503(a)). In applying the regulation to the facts, the court specifically stated:

> It is undisputed that [plaintiff] assisted only with service problems of his assigned customers....As [plaintiff] himself testified, he hoped to sell Verizon products and services to his clients. While with respect to some of them that hope proved to be a pipe dream, to the extent that any of those clients bought additional goods or services from Verizon, he would have been credited with the sale and rewarded with the commission, if any.

*Id.*

Also relevant to the *Palmieri* court's determination was the fact that plaintiff was subject to very little direct supervision (his supervisor was located 100 miles away from his office) and presented no evidence that he was actually directed by Verizon to handle customer service issues. *See Id.* at 13-14. The court reasoned that, "While Verizon surely appreciated the obvious

linkup between responsive customer service and repeat sales, there is no dispute that, at all relevant times, it maintained a separate customer-service department tasked not only to resolve but also to field customer-service issues." *Id*.   Notably, the customer-service department maintained by Verizon and discussed by the court was a multi-tiered account team designated to assist with technical and administrative aspects of a sale, billing, maintenance and implementation.  *Id*. at 5.   Customer service issues were first reported to a central office technician ("Tech"), available by telephone around the clock.  *See Id*.   Techs were responsible for receiving the complaint from the customer and dispatching resources to fix the problem.  *See Id*.   Customers could also contact the network service manager who carried a beeper and was available around the clock.  *See Id.*

 In the present case, unlike the circumstances in *Stevens* and *Palmieri*, Plaintiffs did not make sales during all their service calls, were limited as to when and where sales could occur, could not rely on the customer service department to resolve and field customer issues, and were directly supervised by a sales manager who <u>required</u> them to handle customer service issues for all potential and existing customers.  *See Fenwick Depo*, 55:3-10, 58:5-63:7, 75:8-76:3; *Buss Depo*, 77:17-80:9 and Exhibit 9 thereto.

As discussed in the *Statement of Undisputed Facts* above, during their scheduled Walmart hours Plaintiffs handled customer issues and complaints from both their own customers and other agents' customers.   Accordingly, unlike the situations in *Stevens* and *Palmieri*, Plaintiffs did not make sales proposals to all customers requesting service or with whom they worked.  Further, even if Plaintiffs had made sales and those customers did purchase additional products or services, Plaintiffs would not necessarily have received the credit or the commission.

Humana also attempts to liken the present case to *Palmieri* by claiming it "has always employed an extremely robust customer service department" and Plaintiffs (similar to the plaintiff in *Palmieri*) were not required to engage in customer service. *Defendant's Memo*, p. 6. Plaintiffs do not dispute Humana maintained a separate customer service department; however, that does not change the facts that Plaintiffs were the main point of contact for customers. *Fenwick Depo*, 55:3-10, 58:5-63:7, 75:8-76:3.   Plaintiffs were <u>required</u> to respond to customer issues, regardless of whether the customer was Plaintiffs' customer, and despite their response may not involve any sale or commission.  *See Id.*; *see also Manazer Depo*, 32:1-9 ("if a person has a question and is unable to reach his or her sales agent, they are able to contact me with their questions so that they don't feel completely lost").

Further, even when customer service was involved, Plaintiffs were regularly required to: (1) conduct three-way conference calls with pharmacies and/or doctor's offices and customer service to get medication coverage resolved; (2) enter customer issues in MSOP and, once they received a response from customer service, call the customer back with the response; and (3) conduct three-way conference calls between customers and customer service because customer service was unable to provide assistance.  *See Kowalczyk Depo*, 65:19-68:16; *Lane Depo*, 57:14-59:1.

The job/competency description for captive agents also specifically requires them to embody the brand promise of "Guidance When You Need It Most," meaning captive agents are <u>expected</u> to answer customer questions and satisfy customer needs.  *DeVincentis Depo*, 25:25-27:6 and Exhibit 1 thereto.  Julia Fenwick testified in accordance with such requirement, stating that captive agents were the "first line of response;" if the captive agents were unable to manage the problem then customers were sent to her (as the sales manager), and customer service was

the last resort. *Fenwick Depo*, 55:3-10.   Ms. Fenwick also testified that captive agents were required to return customer calls to deal with their concerns and rarely, if ever, were customers directed to customer service by the sales agents because customer service was "inept" and did not have the appropriate knowledge to deal with a number of client issues.  *Id.* at 58:5-63:7, and Exhibit 3 thereto.

Thus, it is clear the customer service type duties were primary and not incidental to sales. In fact, it is arguable that making sales was incidental to customer service.

> ### ii.   *Plaintiffs spent considerably more time on non-exempt duties, than on sales (or exempt duties).*

Humana's emphasis on customer service and marketing (over sales) also is evident from the manner in which the Plaintiffs allocated their time at work.  Based on Medicare guidelines and regulations, Plaintiffs were limited to a selling season of essentially November 15 through December 31 and January 1 through March 31 (the latter part of which only allowed for changes to existing plans, not new sales).

Plaintiffs year was essentially broken into four periods:  (1) **Open Enrollment Period** ("OEP") from **January 1 through March 31 -**  Medicare Advantage plan members can make one change to his or her plan; (2) **Rest of the Year** ("ROY") from **April 1 through September 31** – Medicare Advantage products can only be sold to members who have a special election and captive agents can market non-Medicare Advantage products (3) **Annual Notice of Change** ("ANOC") from **October 1 through November 14** – focused on informing members of any changes to their plan in the coming year so they can decide if they want to stay on their current plan; (4) **Annual Enrollment Period** ("AEP") from **November 15 through December 31** – focused on enrolling new members.  *See Manazer Depo*, 21:13-23:23, 35:19-43:6; *Humana 30(b)(6) Depo*, 107:22-126:8.

During AEP (November 15 – December 31), agents are focused on enrolling new members. *Manazer Depo*, 21:13-23:3. Outside the AEP period:

> ...the sales agents are generally going to be interested in meeting prospective clients and marketing products to them. They also are going to be responding to questions of their clients and meeting their needs. They are going to be doing special events such as a SilverSneakers open house or going to the -- like the senior expo. Something of that nature. But they have their duties which is mostly to meet the public and respond to meeting their needs.

*Id*. at 23:15-23:23; *see also Id*. at 23:24-27:22 (for details of marketing and special events); *see also Lane Depo*, 127:9-128:21 (Plaintiffs were required to visit physician's offices, which did not result in sales or referrals, for the purpose of letting these offices know that Defendant cared about the community).

The fact Plaintiffs were only allowed to sell Medicare products during a limited period each year further evidences the fact that Plaintiffs were not the typical salespeople to which the exemption applies. Plaintiffs sold a product subject to strict guidelines regarding sales opportunities. *See Manazer Depo*, 29:9-30:2. Plaintiffs were not allowed to sell Medicare products during most months of the year and instead spent that time servicing Humana customers, marketing Humana's brand, and building the product name.

### iii. *Plaintiffs received commission based pay but were limited in their solicitation of new business.*

The Plaintiffs income was largely derived from Commissions. Plaintiffs acknowledge that fact. However, regarding Plaintiffs' ability to solicit business, Plaintiffs were bound by both insurance regulations and supervisory oversight.

As discussed above, enrollment periods limited Plaintiffs' ability to sell and actively market products year around. In addition, there were other restrictions that limited agents'

activities.[6]  *See Humana 30(b)(6) Depo*, 32:21-34:3, 78:5-13, 107:22-126:8.   For example, Plaintiffs were not allowed to perform outside marketing to solicit their own customers, but instead were required to rely on leads provided within Humana that are delegated among the agents by their sales manager.  *Lane Depo*, 47:11-49:6; *Humana 30(b)(6) Depo*, 56:23-59:16. Plaintiffs also were not allowed to place cold calls or purchase leads.  *Lane Depo*, 200:23-201:4; *Kowalczyk Depo*, 53:2-55:1.  Thus, they relied heavily on Humana to direct the form and content of all sales actions.

In sum, there were <u>significant</u> restrictions placed on Plaintiffs with respect to selling and marketing Humana Medicare products.  Thus, although a portion of Plaintiffs' income was commission based, unlike employees subject to the outside sales exemption, Plaintiffs were not given free reign to solicit customers and sell however much or as little as they wanted, and Plaintiffs were definitely not free to manage their customers and sales as they pleased.  Plaintiffs were also not in a position to manage their own hours to earn as much or little as they chose.

### iv.   *Plaintiffs were subject to direct supervisory oversight in the performance of their duties.*

Contrary to Humana's assertion that Plaintiffs were not subject to direct or constant supervision (and further unlike the situations in *Stevens* and *Palmieri*), Plaintiffs were <u>closely</u> monitored by their supervisors.   Julia Fenwick and Troy Buss testified at length about the constant supervision maintained over captive agents.  *See Fenwick Depo*, 8:23-13:2; *Buss Depo*. 37:12-38:10; *Humana 30(b)(6) Depo* 63:22-72:21.   Ms. Fenwick and Mr. Buss not only scheduled appointments for the sales agents, they directly monitored their activities and calendars to ensure that they were engaging in the appropriate events and making appropriate

---

[6] These limitations included only sending specific form letters to customers, when and how applications can be processed (which also affected agent commissions), when and how to conduct sales presentations, and when and how the products could be marketed.

contact with their clients.  *See Id*.  They also engaged in required weekly meetings with their captive agents and Mr. Buss placed time restrictions on his agents to open and respond to certain e-mail communications.  *See Buss Depo*, 58:24-63:8.

Not only were Plaintiffs' activities directly monitored by their supervisors, if their supervisor scheduled appointments for Plaintiffs that they were unable to attend, Plaintiffs were required to call and let their supervisor know in order that other arrangements could be made. *See Humana 30(b)(6) Depo*, 58:21-60:7, 63:22-65:18, 66:8-69:12.   In addition, Mr. Buss carefully monitored his captive agents' Walmart hours and if he determined Plaintiffs were not at Walmart during her scheduled hours, Mr. Buss would require a sign-in and sign-out sheet to track when they arrived and when they left.  *Buss Depo*, 50:17-51:13, 76:18-77:12.

### 2. Plaintiffs Were Not Regularly Engaged Away from Humana's Place of Business.

As set forth above, in addition to the primary duty requirement, the outside salesman exemption also requires that such primary duty be performed "customarily and regularly...away from the employer's place or places of business."  29 C.F.R. § 541.500(a).  "Away from the employer's place or places of business" is defined as making sales "at the customer's place of business or, if selling door to door, at the customer's home." 29 C.F.R. § 541.502. "Thus, any fixed site, home or office, used by a salesperson as a headquarters...is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property."  29 C.F.R. § 541.502 [emphasis added].

Humana claims there is no dispute that Plaintiffs were customarily and regularly engaged away from their offices.  *Defendant's Memo*, p. 14.  Although Plaintiffs do not dispute they conducted sales presentations at customer's homes and in differing public locations, they also spent a significant portion of their time working at their homes and at designated Walmart stores.

As pointed out by Humana, "Both Plaintiffs testified that their offices were their homes." *Defendant's Memo*, p. 14.  Further, Plaintiffs were <u>required</u> to spend at least fifteen hours per week at Walmart during specified hours, scheduled and tracked by their sales supervisor, pursuant to a contract between Humana and Walmart.  *Fenwick Depo*, 16:6-24; *Buss Depo*, 50:17-51:13; *Lane Depo*, 78:14-79:7; *Kowalczyk Depo*, 50:5-51:12.

Although in a literal sense Plaintiffs' homes and Walmart are "away from" Humana's place of business, the DOL Regulations make clear that the analysis is not so literal.  As stated above, the DOL Regulation specifically interpreting such provision states:  "...any <u>fixed site, home or office, used by a salesperson as a headquarters</u>...is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property."  29 C.F.R. § 541.502 [emphasis added].  Accordingly, because Plaintiffs' home offices and the Walmarts they were stationed are fixed sites used as headquarters, they are considered Humana's places of business.  Accordingly, despite Humana's summary dismissal of this element of the exemption, Plaintiffs were not "customarily and regularly" away from Humana's places business.

### 3. The Rationale Behind The Outside Sales Exemption Does Not Fit The Circumstances Of This Case.

Further evidencing that Plaintiffs are not exempt under the FLSA is the rationale behind the exemption.  As set forth in the above, the rationale behind the outside sales exemption is the inability to track outside sales employees' hours based on lack of supervision and no way of knowing what the employee is doing throughout the day.  *See Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir.1941).  There is no question the outside sales exemption is necessary in situations where employees are unsupervised, can work as little or as many hours as they wish and are regularly away from the employer's places of business.  In those

circumstances, it would be virtually impossible to know what an employee is doing or how many hours that employee is working.

In the present case, it is apparent Plaintiffs were highly restricted, could not work as much or as little as they wanted, and had set hours at a fixed location. It is undisputed that Plaintiffs' sales supervisors closely monitored their daily activities, scheduled and tracked their appointments, scheduled their Walmart hours (and held them accountable for such hours), tracked and reviewed their calendars on a daily basis, required customer calls to be returned within a particular timeframe, and even required e-mails to be opened or responded to in a particular timeframe. This clearly is not the intended situation which the outside sales exemption applies, especially considering Plaintiffs all but punched a time clock. Accordingly, considering the stated intent of the exemption, there can be no question Plaintiffs were not exempt.

**B.      Similar To Plaintiffs' Federal Claims, There Remain Material Questions Of Fact With Respect To Plaintiffs' State Law Claim.**

As recognized by Humana, Plaintiffs' state and federal claims derive from the same factual allegations and liability under the FLSA consequently results in liability under the Idaho Wage Claim Act. *Defendants Memo*, pg. 15 (*citing Smith v. Micron, Electronics, Inc.*, No. CV-01-244-S-BLW, 2005 WL 5328543, 7 (D. Idaho Feb. 4, 2005). Thus, based on the arguments set forth above, Defendants are not entitled to summary judgment on Plaintiffs' state law claim.

**V.**
**CONCLUSION**

For the reasons set forth above, and in the record on file herein, Plaintiffs respectfully request Defendant's Motion for Summary Judgment be denied, and that they be given the opportunity to present their entire case to a jury to determine the outstanding issues of fact discussed herein.

DATED this 12th day of January, 2011.

MORROW & FISCHER, PLLC


By:____/s/ Julie Klein Fischer_____
        Julie Klein Fischer
        Shelli D. Stewart
        Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of January, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

James C. Dale
jcdale@stoel.com

James M. Coleman
jcoleman@constangy.com

Maureen R. Knight
mknight@constangy.com


_____/s/ Julie Klein Fischer_____


T:\Clients\L\Lane, Marisa 25002\Pleadings\Summary Judgment\Memo Response to SJ.doc