UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARISA LANE, CARRIEANNE ZOWALCZYK, JOHN DOES 1-100, | Case No. 1:09-CV-380-MHW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| HUMANA MARKETPOINT, INC., a Kentucky corporation, | |
| Defendant. | |

Currently pending before the Court for its consideration is Defendant's Motion for Summary Judgment (Dkt. 37), filed December 17, 2010.

## BACKGROUND

Plaintiffs Marisa Lane and Carrieanne Zowalczyk (collectively, "Plaintiffs") filed this lawsuit against Defendant Humana Marketpoint, Inc. ("Humana") alleging violation of the Fair Labor Standards Act (FLSA) for failure to provide overtime compensation for hours worked in excess of forty (40) hours in a week and also alleging violation of the Idaho Wage Laws for failure to pay wages due and owing.

Humana is a health benefits company that sells health benefit and insurance products, such as Medicare. Plaintiffs were hired by Humana in 2005 as Sales

Representatives.[1]  Plaintiff Zowalczyk began employment in September 2005 and

Plaintiff Lane in October 2005.  Both Plaintiffs' employment with Humana ceased in

February 2009.   Plaintiffs were compensated in the form of a base salary, plus

commission on their sales.  In 2007, Plaintiff Lane's commissions represented 68% of her

$65,682.98 in earnings and in 2008, commissions represented 65% of her $74,268.01 in

earnings.  For Plaintiff Zowalczyk, commissions represented 69% of her $67,678.41 in

earnings in 2007 and 68% of her $78,157.21 in earnings in 2008.[2]  As part of their

commission, Plaintiffs received a retention commission each month for every customer

who continued in the plan.

While they worked at Humana, Plaintiffs primarily sold Humana's Medicare

products.  Due to the general enrollment season for this product, the busiest time for sales

was between November 15 and March 31.  However, Sales Representative could sell

Medicare products all year to individuals who were "aging in" to Medicare eligibility,

---

[1]  There is some dispute over Plaintiffs' actual job title.  Their offer letters referred to their title as "Sales/Marketpoint Sales Representative," Lane testified that she was hired as a "captive agent," and their business cards read "Sales Associate."  (Lane Dep. (Dkt. 37-6), attached as Ex. 3 to Coleman Aff. at 168:5-12, 169:2-12; Zowalczyk Dep. (Dkt. 37-5), attached as Ex. 2 to Coleman Aff. at 115:18-22; Ex. 5 (Dkt. 37-8)).  The Court will refer to them as Sales Representatives.  Humana also cites to a job listing for the position during the relevant period, which summarized the position.  Plaintiffs contend this job listing was disclosed after discovery.  Further, Plaintiffs contend they never saw the job listing either before or during their employment with Humana.  The Court will not consider the contents of this document.

In addition to the "captive agents" or Sales Representatives, there were also "independent agents" retained by Humana to sell its products.  Independent agents were not limited to selling only Humana products and worked solely on commission. (30(b)(6) Buss Dep. (Dkt. 40-3) attached as Ex. A to Fischer Aff., at 16-18, 102-106; DeVincentis Dep. (Dkt. 40-7), attached as Ex. E to Fischer Aff. at 63, 66; Manazer Dep. (Dkt. 40-6) attached as Ex. D to Fischer Dep. at 13.)

[2]  These earnings do not include any car or mobile communication allowance received by Plaintiffs.

**Memorandum Decision & Order - 2**

moving into a new geographic area, or had otherwise become newly eligible.  Plaintiffs

were also required to sell other products year-round, such as life insurance, long-term

care, annuities, and indemnity plans.

Prior to their employment with Humana, Plaintiff Lane held sales positions for five

years and Plaintiff Zowalczyk sold insurance products and held various sales positions

earlier in her career.  Both Plaintiffs were licensed to sell insurance products prior to their

hire by Humana.

When Plaintiffs were first hired in 2005, they reported directly to sales manager

Julia Fenwick.  In July 2007, Troy Buss replaced Ms. Fenwick as sales manager for

western Idaho and eastern Oregon and became Plaintiffs' direct supervisor.  Upon their

hire, Plaintiffs attended a three-week training course on selling Defendant's products,

including training on sales techniques.  In addition to this initial training, they attended

several sales training meetings throughout their employment.  The contents of these

trainings included: product requirements and information, maintaining the book of clients

and not losing clients, conducting grassroots marketing, developing trust and rapport with

customers and prospects, recognizing different client personality types to be able to best

help them find the products that best fit their needs, and answering questions and

objections from prospects with respect to new products.  Plaintiffs were also required to

engage in continuing education to maintain their licenses to sell insurance.  In conjunction

with their sales training throughout their employment with Humana, Plaintiffs also

received customer service training.  (Lane Dep. at 115; Zowalczyk Dep. at 62-65.)

Plaintiffs also attended weekly sales meetings with their Sales Manager. At these meetings, attended by other Sales Representatives, they discussed issues such as new product rollouts, sales numbers, any issues coming up, and trends in the area.

Plaintiffs were provided with a wide assortment of "sales tools" including brochures, pens and giveaways. For work equipment, they were provided a laptop computer, a printer, and a projector and screen. They were also reimbursed for numerous sales activities, including the purchase of meals for seminars and items for health fairs. They were given a car allowance of $350 per month because their positions required them to travel. Humana also provided a software program in order to assign sales presentations and seminars to its Sales Representatives and to provide them with a tool in which to track and schedule sales-related activities, including maintaining a database of their customers, creating mass mailings, and managing their prospects.

As part of their duties, Plaintiffs sold Humana's insurance products by conducting individual presentations to potential customers. Each presentation lasted two to three hours. The public location of the presentations varied, often at a customer's home, a sales seminar or a location such as a coffee shop. They never occurred at Plaintiffs' homes, which operated as their offices. Plaintiffs also conducted sales presentations in group settings, called seminars. These seminars were sales presentations to a group that could be as large as 30 to 50 customers, depending on the venue. The seminars often took place in restaurant settings, hotel meeting rooms, and other public locations.

The sale of Medicare products is regulated by the Centers for Medicare and

Medicaid Services (CMS), part of the United States Department of Health and Human Services. The CMS classifies events as either sales events or educational events. Plaintiffs' Sales Manager, Troy Buss, testified that in his experience, Humana has only done sales events. At sales events, Sales Representatives can talk about the product, hand out their business cards, pass out flyers, and set up sales appointments.

There are two subsets of sales seminars that were also reported to CMS. One type is the New Member Orientation (NMO). The purpose of this type of seminar is to reacquaint the customers with the program for which they had signed up and be available as a point of contact within the community for people who may have questions in the future. These NMOs were instrumental in retaining customers in the programs. Additionally, sales prospects often attended the NMO seminars with their friends who were already customers. Plaintiff Zowalczyk testified that she would make sales to these prospects at a NMO from time to time.

Another subset of seminars was the Annual Notification of Change (ANOC). These would take place in October to alert existing customers about changes in the product for the upcoming year. Then, beginning on November 15, customers had the option to renew or not renew with Humana. Plaintiffs attended these seminars with their customers which sometimes resulted in follow-up meetings if the customer was considering switching plans. When an existing customer switched plans, the Sales Representative would receive the same commission for that sale as he or she would for bringing in a new customer.

**Memorandum Decision & Order - 5**

Plaintiffs also engaged in other marketing efforts, such as going to doctors' offices and senior centers so that if any issues arose, the Sales Representative would be the point of contact. Plaintiff Zowalczyk testified to marketing through doctors' offices and pharmacies. Plaintiffs also attended community events and ice cream socials to prospect for potential sales customers. Even during the times of year when Plaintiffs were not allowed to make sales to the general population, they were encouraged to be out soliciting and keeping their leads. (Fenwick Dep. (Dkt. 37-7), attached as Ex. 4 to Coleman Aff. at 53-54.) Plaintiffs also used mailings and other literature as part of their marketing efforts. These items would educate their customers and prospects about new products, invite them to a community event, or ask them to attend a seminar.

Both Plaintiffs were required to keep hours at Walmart during the week, for approximately three or four hours a day.[3] These hours were fixed and mandatory. While at Walmart, the Sales Representatives could give a sale presentation if the environment was conducive to that or schedule appointments to give presentations to potential customers in their homes. Also during this time, Plaintiffs were required to deal with all customer issues that arose, including those of other agents' customers. After their Walmart hours, Plaintiffs would conduct sales appointments, meet with existing customers, and do marketing. Plaintiffs would also work on Saturdays, doing sales presentations in customer's homes or at coffee shops and attending ice cream socials or

---

[3] Humana had an agreement with Walmart that allowed the Sales Representatives to setup information kiosks or distribution tables near the pharmacy areas so that the Sales Representatives could provide service to senior citizens and enroll them on site. (Fenwick Dep. at 16.)

other public outreach events.

Plaintiff Zowalczyk testified that during the peak sales season, she spent approximately 50 percent of her time doing sales presentations, 5 percent of her time completing applications for new sales, 10 to 15 percent on marketing efforts, and 30 to 35 percent assisting customers with service issues. (Zowalczyk Dep. at 96-97.) She testified that approximately 90 percent of the customer service work was done for her own customers. In the off-peak season, Plaintiff Zowalczyk testified that she spent approximately 25 to 30 percent of her time doing sales presentations. The rest of the time she characterized as "customer service." Included in that time were her Walmart hours, which resulted in referrals, and her marketing efforts. (Zowalczyk Dep. at 94-97.)

Both Plaintiffs used their homes as their offices and were not required to check in at Humana's regional office. They were not required to be available during any specific time, other than scheduled events and meetings. Sales Representatives worked on their own for their sales work and sales presentations, other than the occasional ride-along with their Sales Manager for feedback. Their supervisors would, however, deliver leads to Plaintiffs, schedule and track their appointments and seminars, and monitor their daily reporting. The Sales Manager would engage in required weekly meeting with their Sales Representatives and required specific time-frames for responding to calls and e-mails. Plaintiffs' former Sales Manager, Julia Fenwick, testified that if a Sales Representative met their sales quota for the week, it did not matter how much they worked for the rest of the week. (Fenwick Dep. at 30-31.) The Sales Representatives had several performance

measures, including sales activities and timely submission of sales applications. Responding to customer service issues was not a performance measure and not monitored, with the exception of customer complaints. Plaintiffs' most recent supervisor, Troy Buss, monitored the Walmart hours and would require a sign-in and sign-out sheet to track hours if it was determined that the Sales Representatives were not at Walmart when they should be. Additionally, Plaintiffs were required to log their time into a timekeeping system and submit a time sheet every two weeks; however, the system only allowed them to log 40 hours per week.

Plaintiffs obtained prospects for new customers through a variety of sources, such as referrals from existing customers, people they met at Walmart, referrals from the Walmart pharmacists, and leads generated by Humana. When Plaintiffs closed a sale, they would ask the new customer to refer them to their friends and family. Plaintiffs would often get referrals for new customers this way. Plaintiffs testified they could not do outside marketing on their own to solicit customers but could only rely on Humana to provide leads. Additionally, Plaintiffs were not allowed to place cold calls or purchase leads.

Another aspect of Plaintiffs' duties was to respond to service questions from existing customers regarding coverage or billing issues. Although Humana has a customer service department that also addressed these issues, often times customers would call Sales Representatives with questions. The majority of the time, Plaintiffs were

assisting their own customers with service issues.[4]  However, there were other times when Plaintiffs would assist another agent's customer with services issues.  For example, if the customers were at a seminar that Plaintiff was presenting at or the customers had obtained their business cards, then the customers might contact Plaintiff with service issues even though they were not technically Plaintiffs' customers.  Also, Plaintiffs would assist customers other than their own with service issues if questions arose during their hours at Walmart.  Plaintiffs testified that as their employment at Humana progressed, the focus of their employment was less on selling insurance policies and more on customer service, as well as community outreach, brand and product recognition, and grassroots marketing. (Lane Dep. at 54-56, 57-62, 114-116; Zowalczyk Dep. at 70.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those which may affect the outcome of the case.  *See id*. at 248.

---

[4]  Plaintiff Zowalczyk estimated that 90 percent of her service work was for her own customers. (Zowalczyk Dep. at 105-106.)

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or depositions excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## DISCUSSION

**1.     Fair Labor Standards Act- Outside Sales Exemption**

The Fair Labor Standards Act (FLSA) requires that covered employees who are not otherwise exempt be paid time and one-half their regular rate for all hours worked in excess of forty each workweek. 29 U.S.C. § 207(a)(1). One exemption to this requirement is the "outside sales" exemption. 29 U.S.C. § 213(a)(1). The Department of Labor regulations define outside sales as:

> The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:

(1) Whose primary duty is:
    (I) making sales within the meaning of section 3(k) of the Act

or

    (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).

Section 3k of the Act defines "sale" or "sell" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).

## A.    Primary Duty

The term primary duty is defined in the regulations as:

> the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). The regulations also provide that "[i]n determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations . . . shall be regarded as exempt outside

sales work." 29 C.F.R. § 541.500(b).

Courts should look at all the facts surrounding an employee's job in determining how to classify the employee. *Schmidt v. Eagle Waste & Recycling, Inc.*, 598 F. Supp. 2d 928, 935 (W.D. Wis. 2009). A court must consider the relationship of exempt to non-exempt duties and how essential they are to an employee's job. *Id.* The factors considered by courts in determining an employee's primary duties include: (1) importance of exempt duties to an employee's other duties; (2) how much time is devoted to exempt work; (3) whether the employee's compensation is based wholly or significantly on commission; (4) whether the employee independently solicits new business; (5) whether the employee receives little or no supervision; (6) whether the employee receives specialized sales training; (7) whether the employee was hired and denominated as a sales person; and (8) whether the position was advertised as a sales position. *Id.*; *Nielsen v. Devry, Inc.*, 302 F. Supp. 2d 747, 756 (W.D. Mich. 2003).

In finding that the plaintiffs satisfied the first part of the statute, that is that their primary duty was outside sales, the court in *Nielsen v. Devry, Inc.* noted that the position of "field representative" was posted under the "sales" category in newspapers and on internet sites and the individuals seeking to be hired for the position mentioned their prior sales experience on their applications. *Id.* Additionally, the plaintiffs in that case spent the first month of their employment in training on various aspects of sales, including meeting prospective students and persuading them to submit an application, and subsequently the employees received audio tapes and workbooks that instructed on sales

methods, such as territory management and finalization techniques. *Id*. at 757. The *Nielsen* court found that although the plaintiffs were paid primarily in the form of a straight salary, that salary was increased or decreased based on the achievement of performance objectives. *Id*. The court noted that the FLSA and DOL regulations do not require that an employee be paid commission in order to be exempt as an outside salesperson and that "[s]alaried employees who received more modest commissions, incentives, or performance- based rewards have been found to be salespersons." *Id*. It was noted that plaintiffs were assigned a territory but within that territory, they were responsible for generating the majority of their own leads. *Id.* at 758. As far as the amount of supervision, plaintiffs' employer provided handbooks for speaking with students and detailing how to perform the job, set various quotas and benchmarks, and required detailed, regular reports but for the most part, plaintiffs were in charge of planning their daily schedules and going about their tasks. *Id*. Lastly, the *Nielsen* court found that if an employee's efforts are directed towards stimulating the sales of his company generally rather than the consummation of his own sales, his activities are not exempt. *Id*. at 759.

The court in *Schmidt v. Eagle Waste & Recycling, Inc.* also found that the plaintiff's primary duty was outside sales. 598 F. Supp. 2d 928 (W.D. Wis. 2009), *aff'd*, 599 F.3d 626 (7th Cir. 2010). In finding this, the court noted that: plaintiff made her own schedule and was not supervised directly; although she received a weekly salary, she was also paid in part by commission she generated from her sales of defendant's services and

in fact, close to one-third of her compensation was in the form of commission; plaintiff also engaged in a number of activities only indirectly related to sales but still benefitting her sales activities including designing marketing and promotional materials, attending Chamber of Commerce meetings and social functions to promote sales for defendant, and engaging in activities related to resolving account or service disputes in order to retain customers and make sure they paid their bills promptly; the plaintiff sought out new clients and business and did not merely promote defendant's business; and she had significant independence when pursuing new clients, she was not supervised when making in-person sales pitches and she was not monitored when conducting customer service duties related to her accounts.  *Id*. at 935-36.  In addressing plaintiff's argument that the non-sales work she conducted was "promotional work" and could not be considered exempt, the court held that plaintiff communicated with customers directly and secured contracts from the customers for her own financial benefit; her job was not limited to promoting defendant's business.  *Id*. at 936.  Therefore, she was engaged in direct sales, not "promotional work."  *Id*.

The Ninth Circuit has also recently addressed the distinction between selling and promoting, finding that the distinction between the two is only meaningful if the employee does not engage in *any* activities that constitute selling.  *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 398 (9th Cir. 2011).  The court held that the pharmaceutical sales representatives in that case had no interest in "generally" promoting sales by the company or improving sales across the board but rather directed sales efforts

towards certain products, to a discrete group of physicians, and within a defined geographic area. *Id*.

One court that specifically addressed the "incidental to" prong, that is ". . .work performed incidental to and in conjunction with the employee's own outside sales or solicitations . . . shall be regarded as exempt outside sales work[,]" found that the key determinant is "whether the time in question is spent on promoting the employer's business in general or is devoted strictly to the salesman's own customers." *Palmieri v. Nynex Long Distance Co.*, 2005 WL 767170, *14 (D. Me. March 28, 2005). In that case, the court found that the plaintiff assisted only with service problems of his assigned customers and the fact that some of those customers were not legitimate sales prospects was not determinative of the issue; the regulations do not indicate that the tasks must be fruitful in producing sales or even a legitimate prospect of a sale at the end of the day. *Id*. The court reasoned "a salesman tasked with making high-level repeat sales to existing customers, . . . [has] reason to ensure that his clients receive[] satisfactory customer service." *Id*.

One of the main disputes between the parties regarding whether the Plaintiffs' primary duty was outside sales is the customer service work plaintiffs performed. Defendant maintains that the customer service work Plaintiffs performed was "incidental to and in conjunction with" their sales work and therefore exempt. In the alternative, Defendant submits that even if the customer service duties were non-exempt, their primary duty was still to make sales. Plaintiffs, on the other hand, argue that their

primary duty was *not* sales and that during the course of their employment, sales became

less important and customer service became the significant part of their jobs.  In support

of this, Plaintiffs argue that customer service was not merely "incidental to" sales, it was

a mandatory part of their job and they spent more time on these non-exempt duties, than

on sales/exempt duties.

The Court will review the undisputed facts of this case.  Plaintiffs were known as

"sales representatives" or "sales agents" on their business cards but also were referred to

as "captive agents" (as opposed to "independent agents" that were also employed by

Humana).  Both plaintiffs had prior experience in sales and were licensed to sell

insurance.  While they were paid a base salary, they were also paid commission.  In the

years 2007 and 2008, commissions constituted approximately two-thirds of their earnings.

*Cf. Schmidt v. Eagle Waste & Recycling, Inc.*, 598 F. Supp. 2d 928, 935-36 (W.D. Wis.

2009) (where commission constituted one-third of plaintiff's compensation).  Upon their

hire, they received three weeks of sales training similar to the Plaintiffs in *Nielsen v.

Devry, Inc.*, 302 F. Supp. 2d 747 (W.D. Mich. 2003).  Additionally, they attended several

sales trainings throughout their employment and received continuing education in order to

maintain their licenses to sell insurance.  Their supervisor at Humana was the Sales

Manager and they had weekly sales meetings with him or her.  Plaintiffs were provided

with various sales tools and also reimbursed for activities related to sales, such as social

functions and use of their cars.  They had designated hours at Walmart each week for

approximately 15-20 hours.  Although there was a definite "peak" season to their sales,

from November 15 through March 31, they could make sales throughout the year. Plaintiffs often conducted sales presentations and seminars at many varied locations, including customers' homes, coffee shops, and hotels. Plaintiffs worked on their own, except for the occasional "ride-along" with their supervisor. While Plaintiffs' supervisors did monitor some of Plaintiffs' activities, this is similar to *Nielsen* where the employer set various benchmarks and required regular, detailed reports from the plaintiffs. *See id.* at 758. Plaintiffs solicited customers and sales throughout the year, by sending out mailings, conducting public outreach events, holding seminars, visiting doctors' offices and senior centers, as well as getting referrals during their Walmart hours. These activities were directed towards a specific product and group of potential customers, not just towards generally promoting Humana's business. Although Plaintiffs did address customer service issues, Humana also maintained a separate customer service department. The majority of the customer service Plaintiffs performed was for their own customers.

The Court finds that when viewing the facts of this case as a whole, Plaintiffs' primary duty was outside sales. The factors listed in the *Schmidt* case support this finding. Of note, a large percentage of Plaintiffs' compensation was from commission, they received a significant amount of sales training and were provided with sales tools and certain allowances that supported the outside sales nature of their position. A significant portion of their time was spent on sales. Additionally, Plaintiffs were denoted as sales persons, had held prior sales positions, and were licensed to sell insurance. Plaintiffs mostly worked on their own and had fairly flexible schedules, with the

exception of their designated Walmart hours and reporting certain information to their supervisors. However, requiring that employees meet certain quotas or report their activities does not defeat an outside sales exemption finding. *See Nielsen*, 302 F. Supp. 2d at 758 (where plaintiffs' employer set various benchmarks and required regular, detailed reports).

While Plaintiffs did perform customer service, Plaintiff Zowalczyk testified that 90% of this was for her own customers. When work is performed incidental to or in conjunction with outside sales, it is also exempt. Plaintiffs had a vested interest in making sure their customers were kept happy and received good customer service. *See Palmieri v. Nynex Long Distance Co.*, 2005 WL 767170, *14 (D. Me. March 28, 2005) ("a salesman tasked with making high-level repeat sales to existing customers, . . . [has] reason to ensure that his clients receive satisfactory customer service.") As far as assisting customers other than their own, Plaintiffs would still have had an interest in providing customer service to become a point of contact and promote their name in the community for referrals. The customer need not be a legitimate sales prospect. *See id*. Plaintiff Lane testified that when she performed what she designated as customer service work, she had very little power to fix anything and would often conduct three-way conference calls between the customer, herself and the pharmacy to figure out what needed to be taken care of. That her role was that of an "emissary," to act as the face of the company with respect to that customer and make sure the customer was kept happy and knew the problem was being addressed. (Lane Dep. at 58-59).

Additionally, although Plaintiff Zowalczyk testified that in the non-peak season, the majority of her time was spent doing "customer service," the type of work she characterized as "customer service" included marketing efforts. Marketing is not customer service. Marketing efforts would serve to promote Plaintiffs' business and their own financial benefit. *See Schmidt*, 598 F. Supp. 2d at 936 (where plaintiff designed marketing and promotional materials, attended social functions, and engaged in customer service activities and court found she was engaged in direct sales, not promotional work).

It is clear that the most important duty that Plaintiffs performed was sales. In viewing all of the facts of this case and strictly construing the outside sales exemption, the Court find that Plaintiffs' primary duty was outside sales.

### B.     Away from Employer's Place of Business

The second requirement of the statute for the outside sales exemption is that the employee be "customarily and regularly engaged away from the employer's place of business" in performing their primary duty. "Away from the employer's place of business" is defined as making sales at the "customer's place of business or, if selling door to door, at the customer's home." 29 C.F.R. § 541.502. "[A]ny fixed site, home or office, used by a salesperson as a headquarters . . . is considered one of the employer's place of business, even though the employer is not in any formal sense the owner or tenant of the property." *Id.* "Customarily and regularly" is defined as greater than occasional but less than constant. 29 C.F.R. § 541.701.

Humana contends that Plaintiffs conducted most of their sales "away from" their

offices.  Although both Plaintiffs testified that their offices were their homes, they never conducted sales presentations in their homes.  Sales presentations were often conducted in the customer's home or at public locations.  Further, Plaintiffs were given a car and mobile communication allowance to facilitate the "outside" nature of their positions.

Plaintiffs submit that they spent a significant portion of their time working at their home offices and at designated Walmart stores.  Plaintiffs argue that because these were fixed sites used as headquarters, they are considered Humana's place of business.

The Court agrees with Plaintiffs that their homes would be considered the employer's place of business because they were fixed sites from which they worked.  However, the Court does not agree with Plaintiffs' contention that various public locations would also be considered Humana's place of business.  Not every public location where sales presentations, seminars, social functions and the like took place are Humana's place of business.  The regulations define"away from" as a "fixed site . . . used as a headquarters," while some of these public locations that sales took place could arguably be considered "fixed sites," they were not used by Plaintiffs as headquarters.  Further, many sales took place at the customers' homes which clearly fits within the "away from" definition.

Lastly, the regulations provide the employees must be away from the employer's place of business more than occasionally but less than constant.  Plaintiffs' work falls squarely within this definition.  While they did indeed perform work from their home offices, and perhaps even occasionally at the Humana regional office, it was far less than

constant and their activities away from their home offices was far more than occasional.

Accordingly, the Court finds that the Plaintiffs satisfy the second part of the statute, that is they were customarily and regularly performing their primary duty away from the employer's place of business. Because both parts of the outside sales exemption have been satisfied, the Court finds they are exempt from the FLSA overtime statute.

## 2.    State Law Claim

Humana contends that because Plaintiffs are exempt from the overtime provisions of federal law, they would likewise be exempt from the overtime provisions under Idaho law. *See Rodgers v. Basin School Dist. No. 72*, No. CV 04-207-S-EJL, 2006 WL 335453 at *6 (D. Idaho Feb. 13, 2006) (adopting summary judgment ruling as to FLSA claim for Idaho state law claim); *Smith v. Micron Electronics, Inc.*, 2005 WL 5328543 (D. Idaho Feb. 4, 2005).

As the Court has found that Plaintiffs were exempt employees and their FLSA claim fails, their claim under the Idaho Wage Claim Act likewise fails.

## ORDER

**IT IS HEREBY ORDERED:**

1)    Defendant's Motion for Summary Judgment (Dkt. 37) be **GRANTED.**

DATED: June 3, 2011

_____
Honorable Mikel H. Williams
United States Magistrate Judge